## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAULETTE T. GLOVER and JOHN T. WAREHIME, on behalf of themselves and all others similarly situated,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>CONNECTICUT GENERAL LIFE INSURANCE COMPANY and THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>  *Defendants*. | No. 3:16-cv-00827-MPS |

## RULING ON MOTION FOR FINAL APPROVAL OF SETTLEMENT AND MOTIONS FOR ATTORNEYS' FEES, EXPENSE REIMBURSEMENT, AND SERVICE AWARDS

This case, involving an alleged breach of life insurance policy provisions governing "cost of insurance" ("COI") deductions from the investment portion of the policy, has been pending for nine years. The Plaintiffs, Paulette Glover and John Warehime, entered into a Settlement Agreement on behalf of themselves and a proposed Settlement Class of others similarly situated, resolving all claims against Connecticut General Life Insurance Company ("Connecticut General") and Lincoln National Life Insurance Company ("Lincoln National") (collectively, "Defendants"). The proposed settlement provides for $147,474,191.99 to about 191,000 policyholders, less attorneys' fees and related expenses. ECF Nos. 230-1, 350. An Order for preliminary approval of the Settlement was entered by this Court on September 4, 2024. ECF No. 289. The Settlement is now presented to the Court on Class Counsel's Motion for Final Approval of Settlement. ECF No. 328. The Plaintiffs have also filed a Motion for Attorneys' Fees, Expense Reimbursement, and Service Awards. ECF No. 302.

1

The Settlement is opposed by Susman Godfrey LLP ("Susman") as counsel for objectors Vida Longevity Fund LP ("Vida"), TVPX ARS Inc. ("TVPX"), Tim Roberts, Fifth Season Operating LP, FS Operating OF Holdings LP, Nolor Capital LP, Richard and Judy Singh, Jonathan Swerdlow, Ruthie White, John Harkins, and Life Recovery Fund LLC, *see* ECF No. 310, as well as for objectors Jean Heckman and Dolores Aylesworth, *see* ECF No. 316 (collectively, "Objectors").[1]  Susman, on behalf of Vida, TVPX, and Heckman, also filed their own Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards.  ECF No. 304.

The Court assumes familiarity with the parties' submissions, the oral argument at the December 16, 2024 fairness hearing, and the record.  As set forth below, the Motion for Final Approval of Settlement is granted, and the motions for fees, expenses and service awards are granted in part and denied in part.

## I.    MOTION FOR FINAL APPROVAL OF SETTLEMENT

The Plaintiffs have moved for final approval of a proposed settlement between the defendants and the following class:

> All persons who own or owned a life insurance policy, that was active on or after May 27, 2010, and was issued or administered by either Defendant, or their predecessors in interest, the terms of which provide or provided for: 1) a cost of insurance charge calculated using a rate that is determined based on expectations as to future mortality experience; 2) additional but separate policy charges, deductions, or expenses; 3) an investment, interest-bearing, or savings component; and 4) a death benefit.

ECF No. 227 ¶ 5.

Under Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of . . . [a proposed class] . . . may be settled, voluntarily dismissed, or compromised only with the court's

---

[1] The Court also received an objection from the John W. Evans Irrevocable Trust, which merely adopts the arguments of the Vida objectors.  *See* ECF No. 324.

approval." To grant approval, I must "ensure that the settlement class, as defined by the parties, is certifiable under the standards of Rule 23(a) and (b)" and consider whether the proposed settlement is "fair, reasonable and adequate" under the factors set forth in Rule 23(e)(2). *Edwards v. N. Am. Power & Gas, LLC*, No. 3:14-CV-01714 (VAB), 2018 WL 1582509, at *4–5 (D. Conn. Mar. 30, 2018) (internal alterations and quotation marks omitted). For the purposes of determining if a class is certifiable, "the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

The Objectors challenge the plaintiffs' "class standing." "A court is powerless to approve a proposed class settlement if it lacks jurisdiction over the dispute, and federal courts lack jurisdiction if no named plaintiff has standing." *Frank v. Gaos*, 586 U.S. 485, 492 (2019). Under Article III of the Constitution, class representatives must have "standing to assert both [their] individual claims and the class claims brought on behalf of the putative class." *In re Veon Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2021 WL 930478, at *6 (S.D.N.Y. Mar. 11, 2021).

## A. Class Standing

Plaintiffs Glover and Warehime seek to represent a class of persons who owned policies "issued or administered by" Defendants Connecticut General Life Insurance Co. ("Connecticut General") or Lincoln National Life Insurance Co. ("Lincoln National"). ECF No. 227 ¶ 5. As I found in the Ruling on Motion for Preliminary Approval, ECF No. 289, the Plaintiffs submitted substantial evidence—easily satisfying the preponderance standard—that the policies of all members of the proposed class are *administered* by Lincoln National, even while many of the members of the proposed class have insurance policies that were not *issued* by either Connecticut General or Lincoln National. *Id.* at 5–6. Two of the Objectors represent classes of individuals

who have policies issued by Lincoln Life & Annuity Company of New York ("LLANY") and First Penn-Pacific Life Insurance Company ("FPP").[2]  The Objectors argue that the Plaintiffs do not have standing to represent this group of individuals because Glover and Warehime lack contractual privity with LLANY or FPP.  ECF No. 310 at 14–15.  The Plaintiffs argue privity is a merits issue that they are not required to prove to demonstrate standing and obtain settlement approval.  I agree with the Plaintiffs.  As explained below, contractual privity goes to the merits of the Plaintiffs' cause of action for breach of contract, not to the threshold jurisdictional question of standing to sue.

1.  <u>Legal Standard</u>

In the Second Circuit, the test to determine class standing is "distinct from the criteria that govern whether a named plaintiff is an adequate class representative under Rule 23(a)." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 161 (2d Cir. 2014) (citing *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 158 n.9 (2d Cir. 2012)).

> [I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants.

*NECA*, 693 F.3d at 162 (citations and internal quotation marks omitted).  "The core question is whether a plaintiff who has a personal stake in proving her own claims against the defendant has a sufficiently personal and concrete stake in proving other, related claims against the defendant." *Ret. Bd.*, 775 F.3d at 163.

---

[2] The Objectors contend that LLANY is a "wholly-owned subsidiary" of Lincoln National, while FPP is a "sister company" of Lincoln National.  ECF No. 310 at 30.

*NECA* and *Retirement Board*, however, were both decided at the motion to dismiss stage. I must decide whether this standard also applies in the context of class approval for the purposes of settlement. The Supreme Court analyzed the distinction between these contexts in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). It found that a court considering a class for settlement must meet all the requirements of Rule 23, other than whether certification would present intractable management problems at the trial stage. *Amchem*, 521 U.S. at 621 (finding that the "dominant concern [of Rule 23(a) and (b)] persists when settlement, rather than trial, is proposed"). One could reasonably argue that the *NECA/Retirement Board* test should not apply here and that a less demanding test should govern because the nature of a settlement is that it obviates the need for proof of the plaintiff's claims, the "core" focus of *NECA/Retirement Board*. But in the absence of any other guidance from the Court of Appeals, and because the common proof standard is satisfied here, I will nonetheless use the *NECA/Retirement Board* test in this settlement context.

> 2. <u>Privity Arguments</u>

In my preliminary approval ruling, I found that the second prong of the *NECA/Retirement Board* test is met because the Plaintiffs provided evidence demonstrating "it is Lincoln National that has engaged in the conduct that all of the plaintiffs claim is in violation of the relevant contracts," including "determining future mortality expectations and COI rates." ECF No. 289 at 7, 9. The Objectors attempt to poke holes in this finding by arguing that the evidence of Lincoln National's involvement with policies issued by LLANY or FPP is insufficient to demonstrate contractual privity between these issuers and the Plaintiffs. But evidence of privity is not required to demonstrate class standing; rather, plaintiffs have standing to assert claims if the conduct that

injured them implicates the same set of concerns as the conduct that injured all members of the proposed class. *NECA*, 693 F.3d at 162.

"The key lesson from *NECA* and *Retirement Board* is that a named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members . . . when the proof the named plaintiff develops for his or her individual claims also tends to prove the class claims." *Curtis v. Aetna Life Ins. Co.*, 648 F. Supp. 3d 358, 368 (D. Conn. 2023) (internal quotation marks omitted). In this case, privity would be the wrong evidentiary focus for determining class standing because privity would never be a contested issue at trial. There is no dispute about the identities of the parties to each respective policy. The focus of the proof at trial would, instead, be on who determined the COI rate, and how. The Plaintiffs allege that Lincoln National calculated the COI in absent class members' policies issued by LLANY and FPP using the same core method— applying expectations as to future mortality experience ("EFME") as the main ingredient—as in Glover's policy with Connecticut General and Warehime's policy with Lincoln National. The proof that the Plaintiffs would develop for their claims—that the COI rate did not decrease when EMFE was improving—would thus tend to prove the Class claims regardless of who issued the policy. It would be Lincoln National's alleged conduct—not that of LLANY, FPP, or even Connecticut General—that would dominate the trial. That conduct implicates the same set of concerns as the conduct alleged to have caused injury to all other members of the putative class. *See Ruilova v. Yale-New Haven Hosp., Inc.*, No. 3:22-cv-111, 2023 WL 2301962, at *12 (D. Conn. Mar. 1, 2023) ("[B]ecause the alleged harms are premised on the process Defendants used to manage the Plan, the claims involve similar inquiries and proof, and thus implicate the same set of concerns."); *Lanzillotta v. Gov't Emps. Ins. Co.*, No. 19-CV-01465, 2023 WL 2652265, at *3 (E.D.N.Y. Mar. 25, 2023) (although plaintiff lacked class standing to sue all GEICO entities that

subjected putative class members to unlawful deductions in coverage, she had standing to sue GEICO General, "the entity that administered Plaintiff's claims").

The Objectors argue that privity is required because Lincoln National, in administering the policies, only had the contractual power to calculate and recommend COI rates, rather than to actually "set" rates. This is immaterial for the purposes of class standing. Even if the policy issuers had to sign off on Lincoln National's calculations, the Plaintiffs do not allege that the issuers were the ones performing the harmful conduct. There would be little need to elicit testimony at trial from these other issuers because the Plaintiffs allege that when an issuer set excessive COI charges calculated by Lincoln National, the alleged harmful conduct was Lincoln National's.[3] If any charge calculated by Lincoln National was never "set," there could be no resulting injury. And even if an issuer sometimes independently set a rate or used some other administrator—for instance, during the part of the class period where the Objectors allege that Lincoln National did not administer policies—this conduct is irrelevant to Plaintiffs' class standing to pursue claims against Lincoln National. The issuers' approval or act of "setting" COI charges means only that the issuers could be additionally liable for similar injurious conduct.[4]

---

[3] Although the Objectors point to the language of the Indemnity Reinsurance Agreement, ECF No. 61-2, as assigning the issuer, not the administrator, as the entity who "shall set" the COI rates, the Objectors do not contend that Connecticut General did anything other than rely on Lincoln National to do the underlying work of determining rates. The same observation applies to LLANY and FPP. The Plaintiffs contend that Lincoln National, not those two entities, was the one doing the actual work required for the rates to be set. *See, e.g.*, ECF Nos. 263-6 ¶¶ 6–7 (LLANY and FPP executive stating that "LLANY and FPP do not have the staff required to administer the universal life insurance policies that they issue. Instead, they rely on Lincoln National . . . ."); ECF No. 347 at 44–45 ("That structure, where the people who are doing the work are the Lincoln National employees, is common to all three of those issuers for Lincoln National."). The Objectors have not contested this. And so this is sufficient for class standing purposes to show that Lincoln National was largely responsible for the COI rate ultimately charged to policy owners.

[4] The Objectors also dispute the Court's characterization of LLANY and FPP in the preliminary approval ruling as "shell corporation[s]." ECF No. 289 at 9. I agree that that was a poor choice of words and an overstatement. But that does not change the result here. The evidence the Objectors

The Objectors' arguments that Plaintiffs lack class standing due to a failure to present evidence of privity are thus unconvincing.

### 3. Unique Proof Arguments

The Objectors dispute that the proof that the Plaintiffs would develop for their claims at trial is identical for all Class Members, such that the Plaintiffs do not have "a sufficiently personal and concrete stake in proving other, related claims against the defendant," *Ret. Bd.*, 775 F.3d at 163.

First, the Objectors argue that the Plaintiffs do not have any incentive in holding LLANY or FPP responsible for the injuries that the class representatives suffered. ECF No. 310 at 32. LLANY and FPP are not defendants in this action, and so claims against them are not "other, related claims *against the defendant*" for the purposes of standing. And because privity would not be a significant trial issue, it is irrelevant how strong Glover's incentive is to pursue the privity issue.

Next, the Objectors argue that the addition in LLANY-issued policies of a unique clause contemplating expenses in the calculation of COI rates would require unique proof of liability for breach of contract that the Plaintiffs have no incentive to pursue. *Id.* at 44. This clause would not make a material difference in the evidence presented at trial because, again, the key criterion— that EFME persists as the main ingredient on which COI rates are based—is the same. Even if the COI rates in the LLANY policies were uniquely permitted (or required) to account for expenses,

---

presented to demonstrate the issuers' regulatory compliance does not indicate that these issuers' boards of directors personally reviewed Lincoln National's COI rates or that any of the very few employees these companies had were actually involved in doing the work or that, even if they were, they were involved to the exclusion of Lincoln National's employees. Rather, the evidence of record indicates that once the board established criteria for COI rates, Lincoln National performed all the work necessary for the issuers to meet those criteria. ECF No. 263-6 ¶¶ 5-9, 12-13.

this difference does not alter the requirement of proof that EFME was no longer the "main ingredient" (however that term would be defined) in periods in which EFME improved. As I explained in my ruling on the Motion to Amend (ECF No. 189), the critical issue at any trial would be whether EFME was the "main ingredient" in setting the COI rates. Because the additional language in the LLANY policies is not material to the showing of proof at trial, it does not affect the Plaintiffs' standing to assert claims on behalf of owners of policies issued by LLANY.

For these reasons, I find that the Plaintiffs have demonstrated by a preponderance of the evidence that they have class standing for the purposes of settlement.

**B.  Rule 23**

Having found that the Plaintiffs have class standing, I now address whether the class is certifiable under Rule 23(a) and (b) and consider whether the proposed settlement is "fair, reasonable and adequate" under the factors set forth in Rule 23(e)(2).

1.  Rule 23(a) and (b)

At preliminary approval, I found that the numerosity, commonality, predominance, superiority, and ascertainability requirements of Rule 23(a) and (b) are easily met in this case. *See* ECF No. 289 at 10–16. The Objectors object to final approval on the grounds of commonality, typicality, adequacy of representation, and predominance,[5] arguing that the Court's conclusions at preliminary approval were incorrect because the ruling focused on "the supposedly 'cent[ral]' role that Lincoln National played with respect to all of the class policies." ECF No. 310 at 16. Lincoln

_____

[5] For the most part, the Objectors do not distinguish these grounds in their arguments, but suggest that the requirements "tend to merge," and that the core inquiry is to determine whether "the named plaintiffs . . . possess the same interests and suffer the same injuries as the class members." ECF No. 310 at 15 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) and *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011)). Thus, rather than attempting to parse the Objectors' arguments for each requirement, I address them collectively.

National's role as administrator contributed to my finding at preliminary approval that the Plaintiffs had class standing, not that the Plaintiffs had met the requirements of Rule 23. *See* ECF No. 300 at 5 (indicating, in order denying Objectors' request for discovery, that I did not rely on Lincoln National's role as administrator in determining whether the settlement was "fair, reasonable and adequate" under Rule 23(e)). I did, however, address the issue of whether the Plaintiff Glover's privity with Lincoln National affects her adequacy as a class representative or the typicality of her claims, noting that I had not assessed the evidence supporting a claim that she was in privity. Now, the Objectors strenuously object to my musings about privity in the preliminary approval order. ECF No. 310 at 16–27.

They raise strong objections to some of those musings but, ultimately, their objections are beside the point. I do not need to determine the possibility of privity for the Plaintiffs to meet the typicality and adequacy requirements.[6] Rather, it is enough to determine that "Glover is in the same boat as other class members who have policies administered but not issued by Lincoln." ECF No. 289 at 16. A preponderance of the evidence demonstrates that Lincoln National administered policies in the same manner in all essential respects—an alleged failure to adjust COI rates as future mortality expectations improved—regardless of the company that issued the policy.[7]

---

[6] Nor should I, as to do so would defeat the purpose of settlement. "[S]ince the very purpose of compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation, the court must not turn the settlement hearing into a trial or a rehearsal of the trial; and that the court is concerned with the likelihood of success or failure and ought, therefore, to avoid any actual determination of the merits." *Saylor v. Lindsley*, 456 F.2d 896, 904 (2d Cir. 1972) (internal quotation marks omitted).

[7] *See, e.g.*, ECF No. 263-3 at 5 (Master Services Agreement between Lincoln National and LLANY stating that Lincoln National "agreed to perform various administrative services . . . that relate to blocks of life insurance and annuity business acquired by [LLANY]," including "agreements with . . . Connecticut General"); ECF No. 263-5 (Master Services Agreement between Lincoln National and FPP); ECF No. 263-6 ¶ 13 ("As part of the administrate services that Lincoln National provides to LLANY and FPP, after a LLANY or FPP product is developed, Lincoln National monitors the non-guaranteed elements in the product. Lincoln National, on behalf of LLANY and FPP, is

The Objectors' argument that the issuers, not the administrator, were responsible for the final act of approving or "setting" COI rates—once the administrator had done all the work—does not alter this finding. Because the same conduct and the same material policy language are at issue for all claims, the claims against LLANY and FPP in the Related Actions would not require proof of materially different facts than those asserted in the class complaint.[8]

Glover, whose policy was issued by Connecticut General, has the same interest and suffered the same injury as any owner whose policy was administered by Lincoln National, including those issued by Lincoln National (such as Warehime), or LLANY and FPP. The commonality, typicality, adequacy, and predominance elements are met. Numerosity is met because there are some 191,000 policy owners in the class. ECF No. 230-1 ¶ 1.28. And superiority (to the extent it applies in the settlement context) is satisfied because different interpretations by courts of the same policy language would only proliferate if this litigation was prosecuted in piecemeal fashion. I will certify the class under Rule 23(a) and (b).

    2.  Rule 23(e)

Finally, I find that the proposed Settlement is fair, reasonable, and adequate—both procedurally and substantively. Rule 23 sets forth procedural and substantive factors that courts must consider when determining whether a settlement is fair and reasonable. The substantive factors are whether:

> (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed

---

responsible for identifying changes in the issuing company's expectations and analyzing non-guaranteed elements post-issue, including cost of insurance rates.").

[8] As I found in regard to class standing, *supra*, the additional language in policies issued by LLANY does not create a material difference for the showing of proof at trial, and as such it does not create a conflict or affect the adequacy of the Plaintiffs as class representatives. The differences in the issuers' corporate structure and relationship to Lincoln National are also irrelevant in light of the materially identical policy language.

> method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> > (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[9]  The procedural factors are whether "(A) the class representatives and class counsel have adequately represented the class" and "(B) the proposal was negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2).

The Objectors renew their objections from preliminary approval: substantively, that the relief is inadequate and the distribution plan is inadequate and inequitable; and that the settlement was procedurally deficient because the Plaintiffs failed to negotiate the settlement at arms-length and failed to fully analyze mortality improvement for Class policies.  ECF No. 310 at 34–48.  Objectors Heckman and Aylesworth also argue that the Class representatives and Class Counsel have not adequately represented the Class because the settlement includes service awards conditional upon supporting the settlement.  ECF No. 316 at 6–8.  For the following reasons, the objections are overruled.

---

[9] Rule 23(e)(2)'s substantive factors, which were added in a 2018 amendment, "do[] not displace [the Second Circuit's] traditional *Grinnell* factors, which remain a useful framework for considering the substantive fairness of a settlement." *Moses v. New York Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023); *see City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) (directing courts to consider "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation" (internal citations omitted)). Instead, "the rule now mandates courts to evaluate factors that may not have been highlighted in [the Circuit's] prior case law," although the Rule 23 factors "largely overlap" with the "factors outlined in *Grinnell*." *Moses*, 79 F.4th at 243–44.  For the reasons expressed in this section, I find that the settlement is also fair, reasonable, and adequate under *Grinnell*, particularly the first, fourth, fifth, eighth, and ninth *Grinnell* factors.

a. <u>Relief Obtained Through Settlement</u>

Objectors Vida, TVPX, and Heckman are court-appointed class representatives or proposed class representatives in other federal lawsuits—all of which were filed after the case before me—involving life insurance policies that were either issued or administered by Lincoln National: *TVPX ARS Inc. v. Lincoln Life Insurance Co.*, No. 2:18-cv-02989-RBS (E.D. Pa.) ("*TVPX*"), *Iwanski v. First Penn-Pacific Life Insurance Co.*, No. 2:18-cv-01573-RBS (E.D. Pa.) ("*Iwanski*"), and *Vida Longevity Fund, LP v. Lincoln Life & Annuity Company of New York*, No. 1:19-cv-06004-ALC-VF (S.D.N.Y.) ("*Vida Longevity Fund*") (collectively, the "Related Actions"). The Objectors claim that their counsel, Susman, previously discussed settlement of the Related Actions with Lincoln National, as well as with LLANY and FPP. ECF No. 310 at 41–42. The Objectors then allege that Lincoln National negotiated a settlement in this case "in the dollar range that had been rejected [in the Related Actions], but now covering twice as many policies." ECF No. 310 at 42. This account is unconvincing because Susman's unique methodology in valuing its claims in the Related Actions does not undermine the fairness of the parties' calculations in this case.

The Objectors' claim that Susman rejected a settlement proposal in the Related Actions that was "twice as good as the one Glover's counsel accepted," ECF No. 310 at 35, is flawed for two reasons. First, it violates Rule 408 of the Federal Rules of Evidence, which prohibits the use of "conduct or a statement made during compromise negotiations about the claim" as evidence "to prove or disprove the validity or amount of a disputed claim." The Objectors' allegations that they received a settlement proposal in the Related Actions refer to statements allegedly made during or

following a mediation in *Vida Longevity Fund*.[10]  The Objectors' argument that it was offering the exchange "to demonstrate the benefit Susman Godfrey's efforts conferred on the *Glover* settlement class, as well as the inadequacy of the proposed settlement," ECF No. 335 at 8 n.2, is unavailing. Determining the value of Susman's efforts would require me to first determine the "validity or amount of" the Related Actions offer, which Rule 408 prohibits.  At oral argument, Susman conceded that Rule 408 precludes the Court from considering the Related Actions offer, except as an indication of Susman's bargaining power.  ECF No. 347 at 52–53. While the existence of a settlement offer in the Related Actions may be some evidence of Susman's relative bargaining power, there is not enough evidence in the record to find that it was "twice as good" as the offer here.

Second, and in any event, the Objectors' argument on this point is unsubstantiated.  Lincoln National disputes the Objectors' account of these negotiations and argues that the proffered figures do not represent its settlement offer but rather its estimated damages calculations for "a best-case scenario for Objectors if the three cases ran their full course, without accounting for a host of risk factors." ECF No. 332 at 4.  Moreover, Lincoln National argues that this estimate was "calculated under the traditional model used by plaintiffs in COI cases," rather than the methodology proposed by Susman in the Related Actions.  *Id.* at 4–5.  Lincoln National's argument is persuasive; the Objectors attempt to compare apples and oranges.  As I noted at preliminary approval, Lincoln National submitted evidence that the class members in the Related Actions will need to overcome obstacles similar to those the Plaintiffs face here.  ECF No. 289 at 14–15.  Figures calculated

---

[10] Lincoln National contends that the Related Actions settlement proposal was made as part of a mediation, and thus violates the *Vida* parties' confidentiality agreement. ECF No. 312 at 2–3.  The Objectors insist it occurred after mediation had concluded, such that the confidentiality agreement does not apply.  ECF No. 335 at 7–8.  The difference is immaterial for the purposes of Rule 408; only the reason for which the Objectors offer the information matters here.

without considering the risk factors are not comparable to settlement figures that took them into account.[11]  And even if I were to accept Susman's unique damages methodology, it does not show that Class Counsel's calculations here, even though done without a formal damages analysis, is inadequate or "arbitrary."  To the contrary, the evidence in the record indicates that Class Counsel's calculations are fair, reasonable, and adequate.  *See, e.g.*, ECF No. 329-3 ¶ 18.[12]

b.  Distribution Plan

The Objectors also oppose the parties' plan to distribute relief to the class members.  As the Plaintiffs point out, courts in other districts have previously found that a distribution formula calculated by using a pro rata portion of the fund according to COI charges paid by the class members—the one used here—is an adequate methodology.  *See, e.g.*, *Rogowski v. State Farm Life Ins. Co.*, No. 4:22-cv-00203-RK, 2023 WL 5125113, at *3 (W.D. Mo. April 18, 2023).  While using COI *overcharges*, as Susman proposes, may also be a valid formula, such exacting calculation of damages is not needed for purposes of settlement.  Simplifying the formula and forgoing an extensive damages analysis is a reasonable choice in the interests of expediency, sparing further litigation costs and giving more money to the Class members rather than to experts and lawyers.  Further, splitting the Class fund evenly based on COI charges paid is equitable, and it accounts for those Class members who were subjected to COI charges longer than others.

---

[11] Lincoln National also argues that the summary judgment ruling in *Vida* "eviscerated" the merits of Susman's methodology, and further asks that I give the proffered figures no weight because Susman presents them here in violation of a confidentiality agreement.  ECF No. 330 at 5.  I do not need to consider these arguments because I find the methodologies are not comparable.

[12] At the final approval hearing, I rejected the Objectors' arguments that they did not have an opportunity to reply to this submission, noting that the Witt Declaration was evidence, not argument.  ECF No. 347 at 12.  The Objectors also contend that portions of this evidence are not supported by factual or analytical support, but even if I were to agree, discounting any such portions does not sway my conclusion that the proposed methodology is fair, reasonable, and adequate.

The Objectors argue that the proposed methodology fails to discount for credits or offsets provided to a subset of class members.  ECF No. 310 at 41.  They do not, however, demonstrate how this discount would make a material difference on the fairness of the distribution.  The Plaintiffs, meanwhile, argue that this issue affects about 500 policies among the 191,000 in the Settlement Class.  ECF No. 329 at 39 n.26.  The limited number of offsets that the Objectors highlight does not doom the overall fairness of the settlement of these claims arising from the 191,000 policies at issue in this case.  That is so even if the offsets make up a larger percentage of policies in the Related Actions, where the claims are narrower.  Moreover, the funds that class members receive are in exchange for giving up claims for the entire duration of the policies, not only for portions in which they did or did not receive credits.

c.  Procedural Fairness

The Objectors' procedural fairness arguments are also unconvincing.  The evidence demonstrates that Class Counsel had adequate information about mortality improvement for the Class policies to adequately represent the Class.  Class Counsel's experience in similar matters, including trying four cases involving COI, allows them to identify expeditiously the most critical documents needed to determine the key facts and thus the advisability of the proposed settlement.  *See* ECF No. 267-2 ¶ 30.  Class Counsel used this experience in conjunction with data on the Class policies to make informed decisions on the value of their case.  *See* ECF Nos. 303-1 ¶ 40, 329 at 27.  The evidence does not demonstrate that Class Counsel needed to analyze mortality improvement for each Class policy where "the additional alleged key documents cited . . . are also in line with the type of information and data previously considered by Plaintiffs' Counsel," ECF No. 267-2 ¶ 33, and where, as noted above, the key policy language is the same in all Class claims.  The information that the Plaintiffs considered at settlement provides sufficient leverage to permit

fair settlement negotiations. Indeed, if the Objectors' position was taken seriously, no settlement of a COI class action could be approved until exhaustive—and very expensive—discovery was done, including fulsome damages analyses by experts. This runs contrary to Rule 1 of the Federal Rules of Civil Procedure, which requires that all the Rules, including Rule 23, "be construed, administered, and employed by the court and the parties to secure the just, *speedy, and inexpensive* determination of every action and proceeding" (emphasis added).

Moreover, as I found at preliminary approval, the evidence does not suggest that the settlement was the result of collusion when the negotiation was conducted in the presence of an experienced mediator and the litigation was hard fought up until settlement. ECF No. 289 at 18.

### d. Conditional Service Awards

Objectors Heckman and Aylesworth challenge the settlement, as well as Class Counsel's adequacy of representation, by alleging that Service Awards for named plaintiffs were conditional on supporting the settlement, which, they say, creates a conflict of interest between Class Counsel and the Class. These arguments fail because there are no conditional incentive awards in the settlement agreement, and so the fairness of the settlement and the adequacy of representation are unaffected.

The Agreement provides for a service award of up to $50,000 for each Plaintiff in this case and the Related Actions. ECF No. 230-1 ¶ 8.2. The agreement states:

> Class Counsel may move the Court for a service award payment to each Plaintiff and any named plaintiff in a Related Action pursuing the Released Claims (or, if deceased, their estate), in an amount not to exceed $50,000 each to compensate each Plaintiff or named plaintiff in a Related Action for their efforts on behalf of the Settlement Class. Payment of Plaintiffs' Service Awards, if any, shall be made to Plaintiffs or named plaintiffs in Related Actions pursuing the Released Claims (if deceased, their estate), in addition to any settlement relief he, she, or it may be eligible to receive.

*Id.* While Class Counsel moved for a service award payment to named plaintiffs in this action, they did not move for a service award for any plaintiff in the Related Actions. *See* ECF No. 303 at 39–41. Further, the Objectors argue, Class Counsel admitted that they did not move for Service Awards for Related Action plaintiffs on the ground that the latter had opposed the settlement. ECF No. 333 at 6 (citing ECF No. 317 at 16). The Objectors argue that this decision by Class Counsel "dooms final approval entirely." *Id.* (citing *Radcliffe v. Experian Information Solutions Inc.*, 715 F.3d 1157 (9th Cir. 2013); *Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014).[13] I disagree. Even if the Objectors are correct that, based on the opposition brief, Class Counsel was motivated to refrain from moving for Service Awards for Related Action plaintiffs *because* they opposed the settlement, such a decision is not disqualifying.

First, *Radcliffe* and *Eubank* are distinguishable. In those cases, the *settlement agreement* explicitly conditioned the award on supporting the settlement, which *created* both a divergence in interests within the class as well as a conflict of interest because the objectors were also class representatives. Here, however, (1) there is no condition in the settlement agreement that creates a divergence of interest, and (2) the objectors are not class representatives in this action, and so there can be no divergence or conflict of interests within the Class.

Second, courts commonly weigh the contributions that objectors make to see whether they have done more for the benefit of or detriment to the settlement class. *See, e.g.*, *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1327 (2d Cir. 1990) (awarding fees to intervenors who made "minimal" contributions despite their opposition to the settlement); *In re Marine Midland Motor Vehicle Leasing Litig.*, 155 F.R.D. 416, 423 (W.D.N.Y. 1994) (denying fees to those

---

[13] This argument also relies on a Rubenstein Declaration, ECF No. 333-1, which I struck from the record because it was improperly attached to a reply brief. ECF No. 344. Thus, I ignore references to the declaration.

opposing settlement where "any benefit that might have been conferred on the class by [the objector's] counsel has been offset by their efforts to prevent approval of the settlement"); *Zepeda v. PayPal, Inc.*, No. C 10-1668 SBA, 2017 WL 1113293, at *21 (N.D. Cal. Mar. 24, 2017) (no fee awards where objector attempted to disrupt the settlement to the detriment of the class and where "her actions, *on balance*, did not provide a substantial benefit to the Class" (emphasis added)). Thus, I find that Class Counsel's decisions regarding Service Awards were based on their opinion that the Related Action plaintiffs' opposition to the class settlement outweighed their contributions. The language of the agreement would still permit Related Action plaintiffs to receive Service Awards if their contributions to settlement outweighed the effects of their opposition.  Class Counsel's opinion, therefore, does not undermine the adequacy of representation—and certainly not to the point where it would "doom" final approval.

This finding does not mean, however, that Class Counsel's opinion was correct.  The allocation of attorneys' fees and Service Awards is a matter separate and apart from the decision on final approval.  I address the Service Awards in the fees section below.

I have considered the Objectors' other arguments against the fairness, reasonableness, and adequacy of the settlement and find them to be without merit.[14]  For these reasons, final approval of the settlement agreement is granted.

---

[14] Among these other arguments, Objectors Heckman and Aylesworth misread the agreement in arguing that it would release claims of some agents, beneficiaries, attorneys, and other ancillary entities without compensation. ECF No. 316 at 15–16.  These persons are not releasing any claims on their own behalf; the agreement says merely that the class members are releasing claims brought on behalf of the class members by others.  These Objectors also object to the adequacy of notice. *Id.* at 12–15.  The notice requirement under Rule 23 does not require perfection, but the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  The notice plan reached 95.5% of identified Settlement Class Members.  This is highly effective, if not perfect, and I find that it was the best notice practicable under the circumstances, as it included "individual notice via USPS first class mail to

## II.    MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS

As counsel for the Objectors, Susman has also filed a Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards.  ECF No. 304.  Essentially, this motion operates as an argument in the alternative to their objections to final settlement approval: If I overrule their objections to final approval, as I have, Susman contends that I should nevertheless recognize its contributions to settlement and award it, as well as the Related Action plaintiffs, portions of the nearly $147.5 million Settlement Fund.  Of course, these arguments are at odds with Class Counsel's own motion for fees, ECF No. 302, which does not contemplate sharing the Settlement Fund with Susman.  For the following reasons, I find that Susman is entitled to a portion of the Fund as attorneys' fees, but that both Susman and Class Counsel request percentages in excess of the reasonable fees to which they are entitled.

### A.  Legal Standard

In class actions, the Court "may award reasonable attorney's fees and nontaxable costs that are authorized . . . by the parties' agreement."  Fed. R. Civ. P. 23(h).  "What constitutes a reasonable fee is properly committed to the sound discretion of the district court . . . ."  *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  The Court's discretion should be:

> guided by the traditional criteria in determining a reasonable common fund fee, including: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Id.* at 50 (internal quotation marks omitted).  The "percentage-of-the-fund" method is the preferred method for calculating attorneys' fees in common fund actions in this Circuit.  *See, e.g.*, *In re*

---

all Settlement Class Members who were reasonably identifiable[,] . . . further enhanced by the Settlement Website."  ECF No. 329 at 43.

*Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 136 (S.D.N.Y. 2008). The Court may also perform a lodestar crosscheck as a rough indicator of the propriety of a fee request. *See Goldberger*, 209 F.3d at 50.

Awards of attorneys' fees in class actions are not limited to counsel for the class. Rule 23(h) also permits "award[s] to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel." Fed. R. Civ. P. 23(h), Advisory Committee Notes to the 2003 Amendments; *see, e.g.*, *Cnty. of Suffolk*, 907 F.2d at 1327 (holding that counsel for individual plaintiffs who opted out of and opposed a settlement agreement were entitled to attorneys' fees because their work "substantially benefited the class"); *Dubin v. E. F. Hutton Grp., Inc.*, 845 F. Supp. 1004, 1007-08 (S.D.N.Y. 1994) (granting attorneys' fees to counsel in related actions that "catapulted settlement discussion to a new level").

To be entitled to a share of the Settlement Fund, however, objectors typically must provide specific evidence of the work they performed to advance the negotiations or otherwise benefit the class. "In the absence of a showing that objectors substantially enhanced the benefits to the class under the settlement, objectors are not entitled to fees." *Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 513 (D. Del. 2003). In *Spark*, the court noted that "the cases in which objectors are awarded attorneys' fees are few and far between," and that "[i]n such cases, the objectors expended large amounts of time, money and resources, aided the court considerably in its consideration of proposed settlements and fee awards, and the class members were ultimately benefited as a result of the objectors' efforts." *Id.* (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) ("In the absence of a showing that objectors substantially enhanced the benefits to the class

under the settlement, as a matter of law they were not entitled to fees, and the district court did not abuse its discretion.")).

### B. Susman's Impact on the Proposed Settlement

In opposing Susman's fees motion, the Plaintiffs argue that "Susman can point to nothing beyond its own speculation to show Lincoln's decision to settle was impacted by Susman's efforts in the Related Actions."  ECF No. 317 at 23.  While I agree that no action Susman took in the Related Actions is directly traceable to the settlement here, I find that the Related Actions likely affected the timing of Lincoln National's decision to settle.

Susman is far afield from the objecting counsel who were awarded fees in *County of Suffolk*.  There, counsel had conducted "virtually all of the pre-trial discovery and motion practice, including motions for class certification [and i]ts counsel were the only plaintiff attorneys who conducted the two-month trial, which resulted in a jury verdict." 907 F.2d at 1327.  Susman played no litigating role in the case until it showed up to oppose the proposed settlement, and this case was filed almost two years before the earliest of the actions Susman filed.  Nor is Susman directly analogous to the counsel in the related actions who were awarded fees in *Dubin*, a case filed after those lawyers had conducted extensive discovery and which moved toward settlement only after the related actions established the defendants' liability and awarded damages.  845 F. Supp. at 1024–25.

I cannot ignore, however, that Lincoln National participated in settlement talks with an overriding interest in "a resolution in this case that globally resolves the claims of policyholders in Glover's putative class."  ECF No. 263 at 12–13; *see also* ECF No. 263-7 ¶ 3 ("the purpose of the mediation [at which the proposed settlement was reached] was to see if the parties could reach a global settlement that would resolve all, or nearly all, of Lincoln's outstanding COI Decrease

Litigation."). Lincoln National's interest in "global peace" indicates that it was motivated to settle at least in part by the pending litigation in the Related Actions. At the least, progress in the Related Actions likely affected the timing of the settlement here by pushing Lincoln National toward settlement. This is enough for me to find that Susman's work in the Related Actions provided some benefit to the Class, even if its work ultimately had only an indirect or background effect. For example, in *County of Suffolk*, the Second Circuit held that the objecting counsel was entitled to fees where the defendant "admitted that its decision to enter into a settlement agreement was motivated partly by its fear that the jury verdict [awarding significantly more damages] might be reinstated and collateral estoppel applied." 907 F.2d at 1327. Susman's contribution was not as significant as that; but based on my experience and my observation of the timing of the proposed settlement, it is probable that Lincoln National had similar fears that Susman's clients in the Related Actions might eventually prevail—perhaps even using Susman's damages methodology, which, at the time of the proposed settlement, held the potential for significantly higher damages. *See* ECF No. 335 at 5–6. This was, at least, a reasonable possibility of the type contemplated by parties at the negotiation table.

But Susman's impact on the settlement should not be exaggerated. Again, in *County of Suffolk*, the objectors were entitled to fees because they were "the *only* plaintiff attorneys who conducted the two-month trial," and, post-trial, "actively participated in the class settlement negotiations." Susman, by contrast, was not even involved in this case. And although Susman was closer to trial in *Vida Longevity Fund* and the other Related Actions than the parties were here, trial was nevertheless a few steps away, which would naturally reduce the impact of any fear those actions may have instilled in Lincoln National. In the *Vida Longevity Fund* action, for example, Susman would still have to overcome a motion in limine aimed at Susman's damages expert. By

contrast, in *County of Suffolk*, there had already been a jury verdict and the possibility of reinstating it was an immediate concern.

Any threat of higher damages, meanwhile, would have been tempered by Lincoln National's significant doubts over the likelihood of Susman prevailing with their damages model, which had not been tested in any court in the Second Circuit, and the quantity of policies that Defendants breached. The settling parties' arguments that they had good reason to discount Susman's theories (*see, e.g.*, ECF No. 317 at 17–18; ECF No. 330 at 9–14) are persuasive, particularly in light of the later summary judgment ruling in *Vida Longevity Fund*, in which Judge Carter found that for the Defendants to have breached a policy, the *Vida* class had to show that the "the decrease in [the class's] mortality rate assumptions were so significant that the lack of a corresponding decrease in COI rate determinations would cause the Class Policy terms to ring hollow." *Vida Longevity Fund, LP v. Lincoln Life & Annuity Company of New York*, No. 1:19-cv-06004-ALC-VF, 2024 WL 1349221, at *5 (S.D.N.Y. Mar. 31, 2024). Lincon National argues that this ruling "reduces Objectors' damages by over 99% in the *Vida* action," and, if extended to the other Related Actions, "by over 96% in the *TVPX* action, and by over 95% in the *Iwanski* action." ECF No. 330 at 7. Those calculations are generally consistent with my ruling on the Motion to Amend. *See* ECF No. 189 at 13–14 (relying on Seventh Circuit's decision in *Norem v. Lincoln Ben. Life Co.*, 737 F.3d 1145 (7th Cir. 2013), applying Illinois law, to find that a breach occurs only when EFME is not the "main ingredient" of the COI rate, and not where the calculation merely included factors beyond those listed in the policy). Regardless of whether my or Judge Carter's or Lincoln National's views are correct, Lincoln National's documented belief that they are demonstrates that it was not scared into settling with the parties here because of the mere possibility

of substantially higher damages in the Related Actions.  Thus, I conclude that Susman's work in the Related Actions provided only a small benefit to the Settlement Class.

### C.  Susman's Requests

Having found that Susman's work in the Related Actions provided a benefit to the Settlement Class—albeit a limited one—I now turn to the *Goldberger* factors to guide my discretion in determining if Susman's requests for attorneys' fees and reimbursement of expenses are reasonable in relation to the benefit provided.

Under the first *Goldberger* factor, Susman's request fails to accurately reflect the time and labor expended by counsel for the benefit of the Settlement Class.  Susman seeks a lodestar of $9,687,600, based on 11,500 hours of work on the Related Actions through the date of the Settlement.[15]  ECF No. 305 at 9.  To reach this dollar figure, Susman claims that it is entitled to a proportional share of the 25% of the Settlement Fund sought by Class Counsel.  ECF No. 305 at 11, 25.  But Susman bases its proposed share on the total time it spent on the Related Actions, regardless of whether that work had an impact on settlement in this case.  It would be improper to credit Susman for every hour of its work in the Related Actions as contributing to the proposed settlement because, as discussed above, that work had only a limited impact, and particularly because Susman cannot point to any specific work that brought about the settlement.  There is no indication, for example, how many of Susman's thirty depositions and eighteen expert reports had any impact here, or whether those enormous efforts were instead dedicated to developing the largely untested damages model that was never raised in this case and substantially discounted by

---

[15] In conducting the lodestar cross-check, Susman indicates that its attorneys billed below the median rate for AmLaw 50 firms.  ECF No. 305 at 26.  The rates billed are reasonable.

the settling parties.  Without documentation of hours that benefited the Settlement Class, I give the time and labor factor very little weight.

The significance of the second factor, the magnitude and complexities of the litigation, is similarly reduced because Susman does not show whether or how the Plaintiffs built off Susman's work to "provide the complex technical information necessary for its bevy of experts to show that the various defendants did not abide by their contractual obligations."  ECF No. 305 at 28.  To the contrary, one of Susman's main arguments against final approval of the settlement is that the Plaintiffs did *not* use the information from Susman's experts in their relief calculations.  ECF No. 310 at 35–36.

Susman contends that the third *Goldberger* factor, the risk of the litigation, is "not relevant here," as "the risks do not justify the settlement."  ECF No. 305 at 28.  This position cannot obscure two important facts: (1) the earliest-filed Related Action was filed nearly two years after this case, and (2) most of the risk Susman incurred through expenses was unrelated to the limited benefit Susman provided to the Settlement.  First, the timing of the Related Actions, which assert similar claims on behalf of a subset of the putative class here, indicates that much of the groundwork, and therefore the bulk of any risk in bringing these cases, was undertaken by Class Counsel in this action—not counsel in the later-filed cases.  Second, Susman's primary support of the risk factor is that it "advanced $2,511,174.15 in expenses and [spent] over 11,500 hours in attorney time." ECF No. 305 at 28.  But over $2 million of these expenses—eighty percent—went to expert fees. ECF No. 305-2 at 8–9.  Again, there is no indication whether or how Susman's experts' reports benefited the Settlement Class.  The primary risk Susman incurred was in pursuing an untested theory of greatly increased damages, which the evidence shows the Settlement Class largely discounted when calculating the proposed settlement.

"The Second Circuit has made clear that the risk of success is 'perhaps the foremost factor to be considered in determining' the reasonableness of an attorneys' fees request." *Sykes v. Harris*, No. 09 Civ. 8486 (DC), 2016 WL 3030156, at *16 (quoting *Goldberger*, 209 F.3d at 54). Susman's difficulty in arguing in support of the risk factor—and indeed, attempting to downplay it—is a glaring indication that its request vastly exceeds a reasonable attorneys' fee.

The fourth *Goldberger* factor, quality of the representation, leans in Susman's favor. As I found above, Susman's main benefit to settlement was in affecting the timing of settlement here through its work in the Related Actions. Despite starting years after this case, the Related Actions were closer to trial than the present case. While that discrepancy had much more to do with this Court's slow pace than Susman's efforts, it nonetheless likely played some role in the timing of the proposed settlement, as I have discussed. But it was necessarily unrelated to the unique damages theories in the Related Actions, as damages are typically determined after liability is determined. In any event, it was Susman who pushed those related cases forward and, in *Vida Longevity Fund* at least, to a step or two away from trial. Thus, I find that Susman provided strong representation on behalf of the subset of the Settlement Class that it represented in the Related Actions.

But this finding is neutralized by the fifth *Goldberger* factor, the requested fee in relation to the settlement. Susman only worked on behalf of those policyholders with policies issued by LLANY and FPP—about half of the Settlement Class. Yet it seeks a proportional amount of the fees requested by Class Counsel, who worked on behalf of the entire class. This factor thus weighs against a finding that Susman's request is reasonable.

The sixth *Goldberger* factor, public policy, also weighs against Susman, which did no work on the case at bar. In this way, Susman's role departs from that of the objectors in *County of*

27

*Suffolk*, who did all of the work in the case at bar until settlement negotiations began.  Granting Susman funds greater than those awarded to Class Counsel would skew the rationale of *County of Suffolk*, where the court held that it would be inequitable to award fees to intervenors who "made at best 'minimal' contributions to the class" while at the same time denying fees to counsel "whose contribution to the class unquestionably was greater than that of all the intervenors combined." 907 F.2d at 1327.  Here, there is no question that Class Counsel provided a much greater benefit to the full Settlement Class than did Susman.  The cornerstone of a reasonable attorney's fee must be the value provided to the class.  In many cases, time and expenses incurred by counsel in related actions can be valuable proxies for value provided, but that is not so here.

Finally, I must consider that Susman's opposition, which is not well-founded, has delayed approval of the settlement to the detriment of the Class.  As noted above, courts often weigh objectors' contributions to the class against their actions to the detriment of the class.  *Cnty. of Suffolk*, 907 F.2d at 1327; *In re Marine Midland Motor Vehicle Leasing Litig.*, 155 F.R.D. at 423; *Zepeda v. PayPal, Inc.*, 2017 WL 1113293, at *21.  Susman submitted (or tried to submit) extremely voluminous briefing and exhibits in an effort to tank the settlement, which has had the impact of making a very old case even older and further delaying the day class members receive relief.  While I find that Susman's positive contributions ultimately outweigh the significant delay in approval attributable to its objections, the detriment to the Class is reflected in a substantially reduced fee award.

The net benefit that Susman provided is worth ten percent of the total attorneys' fee.  I award Susman $2,949,483.84 as a reasonable attorneys' fee for its net contributions to the Settlement Class.

As for expenses, Susman submitted the entire bill for reimbursement of its litigation expenses for $2,511,174.15, eighty percent of which is attributed to 18 experts with no justification as to how any of these experts advanced settlement in this case.[16]  As noted above, Susman played no litigating role in this case until it showed up to oppose the proposed settlement.  Its fees motion fails to indicate how any of its expenses advanced this case, aside from a conclusory statement that the expenses "were reasonable and necessary, and were spent to further those actions to the direct benefit of the class here."  ECF No. 305 at 30.  As with its attorneys' fee request, Susman cannot show whether or how any of its expenses were spent to benefit the class in this case or were instead spent developing the largely untested damages model that was never raised in this case and substantially discounted by the settling parties.  As such, I deny Susman's request for reimbursement of expenses.

### D.  Class Counsel's Requests

Class Counsel seeks an award of 25 percent of the Settlement Fund and suggests this percentage is significantly less than the one-third they could seek under the settlement agreement, as well as the average award for this type of case.  ECF No. 303 at 22–23.  The itemized hours reports indicate that counsel spent 5,870.6 hours of attorney time on this case, rising to an anticipated 6,670.2 hours when considering future work to be done "protecting the Settlement through the promised appeal" and "settlement administration thereafter."  *Id.* at 33–34; ECF No. 329-2 ¶ 4.  For this they seek a lodestar of $6,201,975, which equates to a lodestar multiplier of

---

[16] Further, the Notice to the Settlement Class advised Settlement Class Members that "no more than $200,000" would be sought from the Settlement Fund for reimbursement for expenses.  ECF No. 303-2 at 28.  Without providing notice, it would be "unfair to spring this [change] on the class at the end of the case."  *In re NTL, Inc. Sec. Litig.*, No. 02 CIV. 3013 LAK AJP, 2007 WL 438320, at *4 (S.D.N.Y. Feb. 8, 2007).  And notifying the class of any change to this limit at this late stage would further delay settlement to the Class's detriment.

5.9.[17]  ECF No. 329-2 ¶ 5.  This represents a total request of $36,868,548.  For the following reasons, I find that the request for 25 percent of the settlement fund is slightly too high.

Under the *Goldberger* factors, the requested fee is largely reasonable.  Of greatest significance, the risk of the litigation calls for a significant award.  "In considering this factor, the risk should be measured at the outset of the case and not at the time of settlement."  *Sykes*, 2016 WL 3030156, at *16.  As Class Counsel notes in its Motion, "[w]hen Class Counsel started the litigation, the meaning of the COI provision had been ostensibly resolved in favor of insurance company defendants by the only precedential federal appellate court decision on the meaning of COI rate provisions."  ECF No. 303 at 29 (citing *Norem*, 737 F.3d 1145).  Because the possibility of establishing liability in the face of this precedent was uncertain, Class Counsel faced substantial risk in pursuing this case on a contingent-fee basis.  That it was able to reach a $147.5 million settlement—which it contends is among the largest cash settlements yet achieved in a COI case— after nine years of litigation, speaks volumes as to the quality of its representation, the magnitude of the litigation, and the time and labor expended.  The percentage of the fund sought is comparable—and even less than—fees often awarded in similar cases, *see Rogowski*, 2023 WL 5125113, at *5 (awarding 33.3% of $325 million fund), supporting a finding that the fee is largely reasonable in relation to the settlement.  Moreover, as noted above, public policy supports awarding fees to counsel who actually performed the work in the case at bar.

Class Counsel's experience in COI cases and their work in other COI cases since this case began, however, somewhat undermines their fee application.[18]  Although this case was filed

---

[17] The Court has reviewed the hourly rates charged and number of hours expended by Class Counsel and finds both to be reasonable.

[18] The third *Goldberger* factor, the risk of the litigation, should be measured from the start of the litigation because it is prospective—it considers counsel's perception of risk at a time counsel decided to pursue the case. That is when a law firm working on a contingency basis must decide

earlier, Class Counsel has since prevailed in numerous other COI overcharge cases.  ECF No. 303 at 25 (citing *Rogowski*, 2023 WL 5125113; *Niewinski v. State Farm Life Ins. Co.*, No. 23-cv-4159, ECF No. 36 (W.D. Mo. Apr. 1, 2024); *Spegele*, 2021 WL 4935978).  And in their motion for final approval, Class Counsel argued that they were able to use the experience gained in other COI cases to expedite the litigation here.  *See* ECF No. 329 at 27 ("Having now taken four COI cases to trial, Class Counsel can identify the critical documents determining liability and damages, which are often limited to a handful of pricing or repricing materials, mortality studies, COI and mortality rate tables, and memoranda (both internal and provided to state regulators) going to determination of non-guaranteed policy elements.  Class Counsel had those documents here, and ample opportunity to review them for purposes of negotiating an adequate settlement." (citation omitted)).  On the one hand, the genuine expertise of Class Counsel in COI cases speaks directly to "quality of representation," a *Goldberger* factor, and undoubtedly benefited the class and contributed to the proposed settlement.  On the other hand, Class Counsel was already awarded fees in those other cases; giving full credit for the same work here would amount to a duplicative award.

Moreover, when considering the complexities of the case in conjunction with its magnitude, I disagree with Class Counsel that the complexities in this case were "substantial." ECF No. 303 at 32.  Rather, the obstacles cited, including the hidden nature of the alleged breach and the class certification process, are not unusual in class actions of this magnitude.  And crucially, despite the duration of this case, it was still many steps removed from trial.  The first

---

whether to invest its time and money into a case. Here—even at the outset—the case promised to be a complex, years-long endeavor.  In contrast, the second factor, including the complexities of the litigation, is retrospective—it looks back at the obstacles that counsel actually overcame to achieve the result.  Thus, in this case, the second factor should be measured from the time of settlement.

phase of discovery was still ongoing when the Plaintiffs filed their Motion for Preliminary Approval. *See* ECF Nos. 225, 229. The benefit of early settlement here calls for a higher payment to the class.

Accordingly, although the benefit that Class Counsel provided to the Settlement Class satisfies most of the *Goldberger* factors, analysis of the second and fourth *Goldberger* factors indicates that the fee request is somewhat too high. On balance, I view the second and fourth factors as warranting a significant but not a major reduction of the requested award: the notion of "benefitting the class" would have little meaning if I found Class Counsel's expertise to warrant a fully duplicative award, given that the award in this case will reduce the payout to class members. And the primary beneficiaries of early settlement should be the class.

A lodestar crosscheck confirms that Class Counsel's request is too high. "'Courts regularly award lodestar multipliers from 2 to 6 times lodestar' in this Circuit." *Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM), 2015 WL 10847814, at *18 (S.D.N.Y. Sept. 9, 2015) (quoting *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 623–24 (S.D.N.Y. 2012)). Class Counsel's request, equating to a multiplier of about 5.9, is at the top of this range. In *Fleisher*, a "hotly-contested" COI class action, the court awarded Susman a lodestar with a 4.87 multiplier, which it described as "on the higher end, but . . . entirely appropriate, given the fact that counsel were ready to go to trial when they settled." *Id.* at *1, *18. Here, the case is still many steps removed from trial, yet Class Counsel seeks a lodestar with a higher multiplier. Although Class Counsel cite cases that say that courts "regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers," *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013), it does not explain why any such case is an appropriate comparator,

and it essentially admits that its multiplier is likely "above average of commonly awarded multipliers."[19]  ECF No. 303 at 36–37.

My decision to award Susman fees for its contributions to the Settlement Class means that I must deduct their fees from either Class Counsel's fees or the Settlement Fund itself.  As noted above, Susman requests a share of the total attorneys' fee.[20]  The collective efforts of Class Counsel and Suman—although independent of and often at odds with each other—led to the creation of the Settlement Fund to the benefit of the Settlement Class.  Susman's work in the Related Actions likely somewhat reduced the time and labor needed to be expended to reach a settlement in this case.  It is appropriate, then, that Susman and Class Counsel should share the total attorneys' fee, but that Class Counsel should receive substantially more.  Moreover, I am unwilling to reduce the award that class members would have received before the objections.

For these reasons, I find that a reasonable attorneys' fee is 20 percent of the settlement fund, for a total attorneys' fee of $29,494,838.40.  Using Class Counsel's lodestar of $6,201,975, this equates to a multiplier of about 4.75, just below the multiplier used in *Fleisher*, 2015 WL 10847814, at *18.

After subtracting Susman's 10 percent of this total fee, I award Class Counsel $26,545,354.56 as reasonable attorneys' fee for their contributions to the settlement.  Class

---

[19] This quote referred to a multiplier of 6.3, which Class Counsel used in its calculations in its Motion for Attorneys' Fees, filed November 4, 2024.  ECF No. 303 at 35–36.  In connection with its Motion for Final Approval of Settlement, Class Counsel updated its lodestar to account for additional work performed through December 7, 2024, resulting in a multiplier of 5.9.  ECF No. 329-2 ¶ 5.  I find that a 5.9 multiplier is still above average of commonly awarded multipliers.

[20] While Class Counsel argues that Susman is not entitled to any share and, alternatively, that its proposed share is too high, they do not suggest that Susman's fee should be deducted from the Settlement Fund in addition to their own fee.  *See* ECF No. 317 at 15–28.

Counsel's expenses are entirely reasonable, particularly when I consider the duration of this case.[21]

Class Counsel's motion for reimbursement of $174,082.63 in litigation expenses (ECF Nos. 303

at 14–15, 329-2 ¶ 6) is granted in full.

### E. Service Awards

Both Class Counsel and the Objectors seek Service Awards for named plaintiffs. Class

Counsel moves for $25,000 for Plaintiff Glover and $10,000 for Plaintiff Warehime, while the

Objectors seek $50,000 for each of the three named plaintiffs in the Related Actions.[22]

"Courts consistently approve awards in class action lawsuits to compensate named

plaintiffs for the services they provide and burdens they endure during litigation." *Anwar v.

Fairfield Greenwich Ltd.*, No. 09–CV–118, 2012 WL 1981505, at *3 (S.D.N.Y. June 1, 2012). I

find that the awards for Plaintiffs Glover and Warehime are appropriate because the services they

provided and burdens they endured materially advanced the litigation and protected the Settlement

Class's interests. I also note that the discrepancy between the awards is appropriate because

Warehime, unlike Glover, did not appear as a plaintiff in this case until March 2024—after the

parties reached a settlement agreement in principle. *See* ECF No. 267-1 ¶¶ 10–11. It is thus much

less clear how actions specifically attributable to Warehime benefited the Settlement Class.

For the same reason, I cannot award the Related Action plaintiffs $50,000 each. The

Objectors argue that "[e]ach devoted significant time to assist Susman Godfrey in the litigation of

those actions, gathering thousands of documents, spending multiple days preparing for their

---

[21] Comparing this request to the $1,358,443.06 that Class Counsel submitted for four years of work in *Rogowski*, 2023 WL 5125113, at *6, underscores my concerns that the complexity of the litigation is reduced when considering Class Counsel's work in other COI cases.

[22] Class Counsel did not move for Service Awards for the Related Action plaintiffs in the Settlement Agreement, on the theory that those cases played no role in creating the Settlement Fund. Nevertheless, I consider *sua sponte* whether they are entitled to Service Awards, in light of my finding that the Related Actions played a limited role in advancing this case.

depositions and being deposed, and staying actively involved throughout the cases." ECF No. 305 at 31. As noted, not every action taken in the Related Action advanced the settlement in this case. And the Objectors do not explain how the Related Action plaintiffs benefited the class here.[23] Therefore, I will only award their abstract contributions (*i.e.*, assisting in contributing to the timing of settlement by agreeing to serve as plaintiffs in the Related Actions) to the same degree as those of Warehime. I award the three Related Action plaintiffs $10,000 each.

## III.  MOTIONS TO SEAL

The Objectors and the Defendants also seek to seal portions of their briefs and related exhibits. The following motions are granted for good cause shown, substantially for the reasons set forth in the motions: ECF Nos. 307, 314, 315, 331, 337.

## IV.  CONCLUSION

For these reasons, the motion for final approval of settlement is granted.

The Plaintiffs' motion for fees, expenses, and service awards is granted in part and denied in part as follows: Class Counsel shall receive $26,545,354.56 in attorneys' fees and $174.082.63 in reimbursement for expenses. Paulette Glover shall receive a $25,000 service award. John Warehime shall receive a $10,000 service award.

The Objectors' motion for fees, expenses, and service awards is granted in part and denied in part as follows: Susman shall receive $2,949,483.84 in attorneys' fees. Susman's request for reimbursement for expenses is denied. The three plaintiffs in the Related Actions—Vida, TVPX, and Heckman—shall each receive service awards of $10,000.

---

[23] The fact that the Related Action plaintiffs oppose settlement does not preclude a Service Award. *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1055 (2d Cir. 1973) ("The presentation of dissident views should not in itself lead to the rejection of fee requests.").

IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
        June 16, 2025